## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Anthony B.,                                          Case No. 24-cv-02467 (LMP/ECW)

       Plaintiff,

v.                                                     **REPORT AND RECOMMENDATION**

Frank Bisignano,[1]
*Commissioner of Social Security*,

       Defendant.

This matter is before the Court on Anthony B.'s ("Plaintiff") Complaint seeking judicial review of a final decision by the Commissioner denying his applications for supplemental security income ("SSI") and disability insurance ("SSDI") benefits. (*See generally* Dkt. 1.) Plaintiff has filed a brief seeking reversal of the final decision of the Commissioner of Social Security ("the Commissioner" or "Defendant") denying him benefits, or in the alternative, a remand for further proceedings.[2] (*See* Dkt. 11.) The

---

[1]    The Complaint named Martin O'Malley, who was the Commissioner of the Social Security Administration when Plaintiff filed his Complaint. (*See* Dkt. 1.) Frank Bisignano became the Commissioner of Social Security on May 7, 2025. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Frank Bisignano should be substituted as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2]    As of December 1, 2022, Social Security Actions under 42 U.S.C. § 405(g) are "presented for decision on the parties' briefs," rather than summary judgment motions. Supplemental Rules for Social Security Actions under 42 U.S.C. § 405(g), Rule 5.

Commissioner has filed a Motion for Summary Judgment and asks the Court to affirm the Commissioner's decision.  (Dkts. 13-14.)

For the reasons stated below, Plaintiff's request for reversal or remand of the Commissioner's decision (Dkt. 11) should be denied and the Commissioner's Motion for Summary Judgment (Dkt. 13) should be granted.

## I.    BACKGROUND

Plaintiff filed his current Title XVI and Title II applications for SSI and SSDI benefits on October 27, 2021.  (R. 307-20).[3]  Plaintiff claimed that his disability began on August 2, 2020, due to his fibromyalgia, bone and muscle deterioration, and narcolepsy.  (R. 307, 314, 351.)  His claims were denied initially and on reconsideration.  (R. 175-201.)  Plaintiff requested a hearing, and on February 21, 2023 and August 15, 2023, Plaintiff appeared for an online video hearing before Administrative Law Judge Jessica Hodgson ("the ALJ").  (R.14, 27.)  The ALJ issued an unfavorable decision on October 26, 2023, finding Plaintiff was not disabled.  (R. 14-27.)

The ALJ followed the identical five-step sequential evaluation process under 20 C.F.R. § 404.1520(a) for Plaintiff's SSDI claim and 20 C.F.R. § 416.920(a) for his SSI claim.[4]  (R. 19-20.)  For SSDI purposes, the ALJ concluded that Plaintiff met the insured

---

[3]    The Social Security Administrative Record ("R.") is available at Docket 10.

[4]    The Eighth Circuit described this five-step process that the Commissioner of Social Security must use as follows:

> (1) whether the claimant is currently engaged in substantial gainful activity;
> (2) whether the claimant's impairments are so severe that they significantly

status requirements under 42 U.S.C. § 416(i) and § 423 through December 31, 2025.  (R. 17.)

Following the five-step sequential evaluation process,[5] the ALJ first determined at step one that Plaintiff had not engaged in substantial gainful activity since August 2, 2020, the alleged onset of disability date.  (R. 17.)

At step two, the ALJ determined that Plaintiff had the following severe impairments: polyarthralgia of the hands, degenerative joint disease of both hands,

---

limit the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has impairments that meet or equal a presumptively disabling impairment specified in the regulations; (4) whether the claimant's [residual functional capacity ("RFC")] is sufficient for her to perform her past work; and finally, if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that (5) there are other jobs in the national economy that the claimant can perform given the claimant's RFC, age, education and work experience.

*Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007).  This five-step process is the same for both SSDI and SSI claims.

[5]    The Eighth Circuit described this five-step process that the Commissioner of Social Security must use as follows:

(1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant's impairments are so severe that they significantly limit the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has impairments that meet or equal a presumptively disabling impairment specified in the regulations; (4) whether the claimant's [residual functional capacity ("RFC")] is sufficient for her to perform her past work; and finally, if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that (5) there are other jobs in the national economy that the claimant can perform given the claimant's RFC, age, education and work experience.

*Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007).  This five-step process is the same for both SSDI and SSI claims.

lumbar degenerative disc disease, depression, narcolepsy, anxiety, cervical degenerative

disc disease, facet arthrosis and spondylitis, adenocarcinoma of the colon, chronic fatigue

syndrome, chronic pain syndrome, fibromyalgia, and an adjustment disorder with

anxiety.  (R. 17.)

At the third step, the ALJ determined that Plaintiff did not have an impairment or

combination of impairments that met or medically equaled the severity of one of the

listed impairments in 20 C.F.R. part 404, subpart P, appendix 1.  (R. 17.)

At step four, after reviewing the entire record, the ALJ concluded that Plaintiff had

the residual functional capacity ("RFC") to:

> [P]erform light work as defined in 20 CFR 404.1567(a) and 416.967(a)
> except can frequently push and pull with hand and foot controls, can
> frequently reach overhead and in all directions bilaterally, can handle finger,
> and feel frequently with both hands, can never use ladders, ropes and
> scaffolds, occassionally [sic] crawl, and frequently stoop, kneel, crouch,
> climb ramps and stairs, and balance. The claimant can face no exposure to
> unprotected heights and moving mechanical parts or operate a motor vehicle
> and can face no exposure to extremes of heat or cold or vibration. The
> claimant is limited to simple routine tasks and simple work related decisions.

(R. 19.)

The ALJ concluded, based on the above RFC, and the testimony of the vocational

expert ("VE"), that Plaintiff could not perform past relevant work as an auto detailer.  (R.

25.)

At step five, the ALJ determined that given Plaintiff's age, education, work

experience, and RFC, there were other jobs that exist in significant numbers in the

national economy that he could perform, including: Laundry Sorter (DOT 361.687-014),

with 45,000 jobs nationwide; Merchandise Marker (DOT 209.587-034), with 137,000

jobs nationwide, and Clerical Assistant (DOT 239.567-010), with 39,000 jobs nationwide. (R. 25-26.)

Accordingly, the ALJ deemed Plaintiff not disabled from the date of Plaintiff's August 2, 2020 alleged onset date through the date of the ALJ's decision on October 26, 2023. (R. 27.)

Plaintiff requested review of the decision, and the Appeals Council denied Plaintiff's request for review, which made the ALJ's decision the final decision of the Commissioner. (R. 1-5.) Plaintiff then commenced this action for judicial review. (Dkt. 1.)

The Court has reviewed the entire administrative record, giving particular attention to the facts and records cited by the parties. The Court will recount the facts of record to the extent they are helpful for context or necessary for resolution of the specific issues presented in the parties' motions.

## II.     RELEVANT RECORD

On August 7, 2020, Plaintiff was seen by David Rossmiller, MD regarding complaints of hand joint pain that had been ongoing on for a few months. (R. 539.) Plaintiff reported that he had stopped his pain medication and decreased his Adderall[6] to see if that offered any relief, which it did not. (R. 539.) Upon examination, Plaintiff was not in any acute distress, he was fatigued, and was uncomfortable due to pain. (R. 541.)

---

[6]     Adderall is a combination of amphetamine and dextroamphetamine used to treat attention deficit hyperactivity disorder ("ADHD") and narcolepsy. *See* https://www.mayoclinic.org/drugs-supplements/dextroamphetamine-and-amphetamine-oral-route/description/drg-20071758 (last visited July 15, 2025).

On October 5, 2020, it was reported during an appointment with Dr. Rossmiller that Plaintiff's dosage of Adderall would be decreased to a single dose of 20 mg at noon and that he would be starting Adderall XR[7] at a 30-mg dose to be taken in the morning. (R. 537.)  Dr. Rossmiller stated that he was starting Plaintiff on the longer acting medication in the morning with a shorter lasting dose at noon, as Plaintiff was still fairly fatigued later in day.  (R. 537.)

On October 27, 2020, Plaintiff reported concerns that he was allergic to Adderall due to a rash that had gotten worse since he started the extended release form.  (R. 532.) He also reported getting a red face after he took Adderall, along with "some ingrown hairs."  (R. 532.)  The provider did not observe anything "significant" on his face during the visit.  (R. 533.)  Although the notes from the October 27, 2020 visit indicate that he was continued on his current medication notwithstanding his concerns (R. 534), notes from a March 13, 2021 visit indicate Plaintiff was taking Ritalin[8] (but no Adderall) (R. 527).  Plaintiff reported on March 13, 2021 that he was fatigued all day and had some benefit from Ritalin, but it did not work as well as Adderall had worked for him.  (R. 527.)

---

[7]    Adderall XR is an extended release form of Adderall.  *See* https://www.mayoclinic.org/drugs-supplements/dextroamphetamine-and-amphetamine-oral-route/description/drg-20071758 (last visited July 15, 2025).

[8]    Ritalin (methylphenidate) is used to treat ADHD and narcolepsy.  *See* https://www.mayoclinic.org/drugs-supplements/methylphenidate-oral-route/description/drg-20068297 (last visited July 15, 2025).

On April 13, 2021, Plaintiff complained of diffuse multiple joint pain and reported being profoundly fatigued, making it hard for him to get out of bed before 2:00 p.m., and then he could only stay up for a few hours. (R. 522.) He again reported that he had some benefit from Ritalin, but that it did not work as well as Adderall. (R. 522.) Plaintiff's dosage of Ritalin was increased. (R. 525.)

On June 10, 2021, Plaintiff complained of all-day fatigue. (R. 518.) He had been prescribed modafinil,[9] but reported that it did not help with his fatigue. (R. 518.) Plaintiff reported taking the medication, and then falling asleep shortly thereafter for about four hours. (R. 518.) Plaintiff noted that he had taken a second dose at times without any benefit, asserting that he constantly felt wiped out, making it hard for him to function. (R. 518.) Plaintiff wondered if his "rash from Adderall" was caused when he changed from getting the generic form from Costco to a different store, as the tablets had a slightly different color. (R. 518.) Plaintiff was started on 30 mg of Adderall, twice daily, and planned to fill the prescription at Costco, as that was the formulation "he did not react to." (R. 521.)

On August 10, 2021, Plaintiff was seen at a rheumatology appointment for his chronic pain and fibromyalgia, including reports that he suffered pain from head to toe that had started many years ago. (R. 452.) Plaintiff rated his pain as severe, and also reported that he dreaded going to sleep because his symptoms were worse then and it was "'impossible' for him to get up once he goes to sleep." (R. 452.) Plaintiff reported

---

[9]     Modafinil is used to treat excessive sleepiness caused by narcolepsy. *See* https://medlineplus.gov/druginfo/meds/a602016.html (last visited July 15, 2025).

constant fatigue and waking up unrefreshed.  (R. 452.)  Plaintiff reported no improvement

on prednisone.[10]  (R. 457.)  The diagnosis for Plaintiff was polyarthralgia and

fibromyalgia.  (R. 457.)  Radiology performed was negative for any inflammatory

changes or joint damage and pointed away from inflammatory arthritis.  (R. 473.)

On August 30, 2021, Plaintiff complained of worsening pain and of all-day

fatigue.  (R. 514.)  Upon examination, Plaintiff did not appear to be in distress, but was

fatigued.  (R. 516.)  Plaintiff reported that he had recently saved people from a fire.  (R.

516.)  Plaintiff suffered from insomnia and narcolepsy.  (R. 515.)  Plaintiff was taking

Adderall for his narcolepsy.  (R. 515, 516.)

On September 28, 2021, Plaintiff was seen for a pain medication check during

which he reported that his pain had been worsening for about the past week to ten days,

to the point where he had not been able to throw a football to his son.  (R. 509.)  He had

"stopped prednisone and seemed like he was a lot worse," but did not observe a great

deal of improvement when on prednisone, and reported that it was harder to get out of

bed when on it.  (R. 509.)  On examination, Plaintiff was not in any acute distress.  (R.

511.)  It was noted that this was a difficult situation, and the plan included a referral a

pain management specialist.  (R. 512.)  Plaintiff's diagnoses included primary

narcolepsy.  (R. 512.)  The course of treatment included a refill of Adderall.  (R. 512.)

---

[10]     Prednisone is an anti-inflammatory medication.  Prednisone Tablets, Cleveland
Clinic, https://my.clevelandclinic.org/health/drugs/20469-prednisone-tablets (last visit
July 15, 2025).

Plaintiff was approved for a personal care attendant ("PCA") on November 10, 2021 through October 31, 2022, to assist with dressing, grooming and hygiene, bathing, eating, and mobility. (R. 718-20.)  He was approved for four hours of assistance per day, mostly in the morning. (R. 718-19, 729.)  The diagnosis listed was initially due to an unspecified disability.  (R. 718.)  On October 18, 2022, his annual care plan was revised to reflect diagnosis of malignant neoplasm[11] of the descending colon and extended through October 2023.  (R. 729.)

On December 14, 2021, Plaintiff was seen for complaints regarding chronic diarrhea, early satiety, poor appetite, nausea, and rectal bleeding, which he had experienced for several years.  (R. 600.)  On March 3, 2022, Plaintiff underwent a colonoscopy, during which a sigmoid colon mass was found.  (R. 586.)  The mass was negative for malignancy.  (R. 593.)

On January 3, 2022, Plaintiff filled out an adult function report.  (R. 373.)  Plaintiff was able to make his own meals, drive a car (for short distances), and go shopping.  (R. 369.)  He could pay bills and handle a savings account.  (R. 369.)  He used to be a mechanic for his friends and family (but no longer was) although his hobbies included occasional tinkering with cars with his son.  (R. 370.)  Plaintiff could handle

---

[11]    A neoplasm is "[a]n abnormal mass of tissue that forms when cells grow and divide more than they should or do not die when they should.  Neoplasms may be benign (not cancer) or malignant (cancer)."  *See* Neoplasm, National Cancer Institute, https://www.cancer.gov/publications/ dictionaries/cancer-terms/def/neoplasm (last visited July 15, 2025).

written instructions up to three steps, but did not do well with spoken instructions.  (R. 371.)

On February 22, 2022, Plaintiff was seen for a medication check.  (R. 573.)  His examination showed he was not in any distress and his psychological examination was normal except for a depressed mood.  (R. 575-76.)  With respect to his chronic fatigue, it was only noted that Plaintiff "did have worsening when off meds in the past."  (R. 576.)

On March 18, 2022, it was recommended that Plaintiff's entire colon be removed because of excessive polyps and the sigmoid mass.  (R. 610.)  During the consult, Plaintiff reported feeling tired, although his examination was normal.  (R. 609-10.)  Plaintiff was told that the colon polyps were not related to his fatigue and fibromyalgia. (R. 610.)

On April 5, 2022, Plaintiff reported that he was disappointed to learn that his colon condition was not the cause of his other symptoms.  (R. 618.)  Plaintiff was continued on Adderall for his fatigue.  (R. 620.)

During a May 3, 2022 consult, Plaintiff sought a second opinion regarding the possible surgical treatment of his multiple polyps in colon and removal of the sigmoid mass.  (R. 687.)  The pathology results was consistent with advanced adenoma.[12]  (R. 687.)  Plaintiff stated that he was tired and fatigued.  (R. 688.)

---

[12]    Adenoma is a "tumor that is not cancer.  It starts in gland-like cells of the epithelial tissue (thin layer of tissue that covers organs, glands, and other structures within the body)."  https://www.cancer.gov/publications/dictionaries/cancer-terms/def/adenoma (last visited July 15, 2025).

On May 16, 2022, Plaintiff was seen for an examination related to possible surgery for his colon. (R. 679.) Plaintiff presented and admitted generalized weakness fatigue and pain, but denied abdominal pain or seeing blood in his stool or on toilet paper. (R. 679.) However, the review of systems stated that he was positive for abdominal pain or cramping, blood in stool, diarrhea, heartburn, and nausea. (R. 679.) Plaintiff's examination showed that he was not in distress and he had a normal appearance. (R. 680.) His mood, affect, behavior, thought content, and judgment were normal. (R. 680.)

Records from the Mayo Clinic dated July 6, 2022 indicate that one of the polyps removed from Plaintiff tested positive for invasive cancer. (R. 790, 808.) One of the options discussed was a colon resection, to which Plaintiff agreed. (R. 792.) Plaintiff also discussed other symptoms including pain and fatigue. (R. 793.) He said he was more worried about those symptoms than the colon malignancy. (R. 793.)

On July 12, 2022, Plaintiff was seen for a neurologic examination with respect to chronic body pain. (R. 801.) The doctor found that Plaintiff had a normal neurologic exam, and did not see any finding to suggest central or peripheral nervous system dysfunction. (R. 806.) Instead, the doctor opined that his symptoms related to his fibromyalgia and chronic fatigue. (R. 806.)

On August 16, 2022, Plaintiff reported he had been taking Vyvanse[13] for his fatigue, finding that it worked better than Adderall, but would take a while to start

---

[13]    Vyvanse is a stimulant indicated for the treatment of attention deficit hyperactivity disorder. *See* https://www.accessdata.fda.gov/drugsatfda_docs/label/2017/208510lbl.pdf (last visited July 15, 2025).

working.  (R. 1306.)  He had been cutting back on his dosage of Ambien, but still reported feeling tired in the morning and claimed that he slept 16 hours per day.  (R. 1306.)

On October 4, 2022, Plaintiff was seen for the first time by Valley Medical and Wellness with respect to the treatment of pain, primarily focused on lower back pain with radiation down his legs.  (R. 963.)  Plaintiff had undergone prior surgeries including a lumbar discectomy, laminectomy in 2014, and cholecystectomy and umbilical hernia repair in 2011.  (R. 963.)  He described his pain as aching, burning, cramping, stabbing, and sharp throughout his entire body.  (R. 964.)  He noted that the pain initially started with his back, but had evolved to include his entire body over the past five years.  (R. 964.)  The pain was worse in the morning and constant throughout the day.  (R. 964.)  Pain was aggravated by activities and relieved with topical gels (Biofreeze).  (R. 964.)  Plaintiff had been told that his pain was not rheumatology related.  (R. 964.)  Plaintiff's medications included buprenorphine-naloxone,[14] Zolpidem Tartrate,[15] Vyvanse,

---

[14]    Buprenorphine-naloxone is a combination medication used in the management and treatment of opioid use disorder.  *See* https://www.ncbi.nlm.nih.gov/books/NBK603725/ (last visited July 15, 2025).  Buprenorphine-naloxone has been increasingly prescribed off-label for chronic pain management.  *See* https://pmc.ncbi.nlm.nih.gov/articles/ PMC3999180/#:~:text=Buprenorphine%2Dnaloxone%20(bup%2Fnal,label%20for%20c hronic%20pain%20management (last visited July 15, 2025).

[15]    Zolpidem is a non-benzodiazepine receptor modulator that is primarily indicated for the short-term alleviation of insomnia, particularly in individuals with sleep initiation challenges.  *See* https://www.ncbi.nlm.nih.gov/books/NBK442008/ (last visited July 15, 2025).

prednisone, and Fluoxetine.[16]  (R. 965.)  Plaintiff's symptoms included fatigue.  (R. 966.)

Plaintiff reported having a girlfriend and that they were having sex.[17]  (R. 966.)

Plaintiff's examination showed that he was not in any acute distress; was well-groomed;

could communicate well; was able to ambulate without the use of assistive devices; had

some tenderness in the neck and thoracic spine; tenderness and limited range of motion in

the lumbar spine; had some range of motion issues with his shoulder but was able to

perform, had a complete range of motion in his hands, wrist and knees; had a normal

neurological examination, and his memory and judgment were intact.  (R. 967-68.)  The

diagnosis was opioid dependance, chronic pain syndrome, lower back pain, fibromyalgia,

and fatigue.  (R. 969.)

On October 18, 2022, Plaintiff was seen for his chronic pain, primarily in his back

and lower extremities.  (R. 948-49.)  Plaintiff sought a higher dosage of his pain

medication.  (R. 949.)  Plaintiff was scored 10 out of 10 for self-cares, family/home

responsibilities, recreation, social activity, occupation, and sexual behavior, but only 6

out of 10 for "basic life-supporting behaviors such as eating, sleeping, and breathing."

(R. 951-52.)  He was described as:

> able to bathe himself, clean the house, be continent of bladder, be continent
> of bowel, converse meaningfully, dress himself, drive, feed himself find his

---

[16]    Fluoxetine is an FDA-approved medication that has demonstrated efficacy in treating a spectrum of psychological conditions.  *See* https://www.ncbi.nlm.nih.gov/ books/NBK459223/ (last visited July 15, 2025).  These indications include major depressive disorder, obsessive-compulsive disorder, panic disorder, bulimia, binge eating disorder, premenstrual dysphoric disorder, and bipolar depression, including cases of treatment-resistant depression when combined with olanzapine.

[17]    The family and social history refer to Plaintiff as "she" and "her."  (R. 966.)

way home, live independently, recognize familiar faces, remember his own
name and remember where he lives but not cooking, remembering the current
date and riding public transportation.

(R. 951.)

The diagnosis for Plaintiff included chronic pain, fibromyalgia, fatigue, and opioid

dependence. (R. 955.) Plaintiff was not in any acute distress. (R. 955.)

On November 1, 2022, Plaintiff was seen related to his back, hip, and leg pain.

(R. 935-36.) Plaintiff's medications included buprenorphine-naloxone, Zolpidem

Tartrate, Vyvanse, prednisone, and Fluoxetine. (R. 937.) Plaintiff was not in any acute

distress. (R. 940.) The diagnosis for Plaintiff included chronic pain, fibromyalgia,

fatigue, and opioid dependence. (R. 941.) Plaintiff noted that he had been on

hydrocodone, but it was causing him pain after every dose. (R. 944.) The

buprenorphine-naloxone helped with his pain, but he claimed it was not enough. (R.

944.)

On November 15, 2022, Plaintiff was again seen related to his back, hip and leg

pain. (R. 918.) Plaintiff's medications included buprenorphine-naloxone, Zolpidem

Tartrate, Vyvanse, prednisone, and Fluoxetine. (R. 919.) Plaintiff was not in any acute

distress. (R. 922.) The diagnosis for Plaintiff included chronic pain, fibromyalgia,

fatigue, and opioid dependence. (R. 922.) It was noted that Plaintiff had overused his

pain medication. (R. 925.) Plaintiff noted sedation with the dosage of buprenorphine-

naloxone, so it was decreased. (R. 925.)

On November 29, 2022, Plaintiff was seen for a follow-up related to his pain

management and a medication check. (R. 903.) Plaintiff had overused his pain

medication slightly.  (R. 903-04.)  Plaintiff's medications included buprenorphine-naloxone, Zolpidem Tartrate, Vyvanse, prednisone, and Fluoxetine.  (R. 905.)  The diagnosis for Plaintiff included chronic pain, fibromyalgia, fatigue, and opioid dependence.  (R. 908.)  Plaintiff was prescribed with a higher dosage of buprenorphine-naloxone due inadequate pain control.  (R. 908, 911.)  Methadone was suggested, but Plaintiff refused, stating "that is what killed his father."  (R. 911.)  Aquatic therapy was suggested because he was deconditioned.  (R. 911.)  While Plaintiff claimed that he was on Vyvanse for his depression, it was noted that this medication treated narcolepsy.  (R. 912.)

On December 5, 2022, Plaintiff was seen for an evaluation regarding his chronic fatigue and fibromyalgia.  (R. 738.)  It was noted that Plaintiff had a new diagnosis of colon adenocarcinoma.[18]  (R. 738.)  Plaintiff reported a 25-year history of wide pain and chronic fatigue.  (R. 738-39.)  Plaintiff's fatigue had worsened over the past three years, and he reported sleeping 18-20 hours per day, especially as to the previous month.  (R. 739.)  Plaintiff's fatigue was associated with significant cognitive impairments and unrefreshing sleep.  (R. 739.)  Plaintiff had also been treated with stimulants over the past five years related to his narcolepsy.  (R. 739.)  The examination for Plaintiff showed he was not in any acute distress and that he had a normal mood and affect.  (R. 740.)  Olivia

---

[18]    Adenocarcinoma is a "[c]ancer that forms in the glandular tissue, which lines certain internal organs and makes and releases substances in the body, such as mucus, digestive juices, and other fluids. Most cancers of the breast, lung, esophagus, stomach, colon, rectum, pancreas, prostate, and uterus are adenocarcinomas." *See* https://www.cancer.gov/ publications/dictionaries/cancer-terms/def/adenocarcinoma (last visited July 15, 2025).

Wangensteen, P.A. found that Plaintiff's presentation was very consistent with central sensitization syndrome, specifically fibromyalgia, but not chronic fibromyalgia. (R. 740.) Wangensteen opined that a review of Plaintiff's medications was appropriate, with possible tapering off Ambien, as it could have been contributing to his exhaustion in the morning, and reviewing the use of stimulants as possibly exacerbating "crash cycles". (R. 741.) Wangensteen also concluded that:

> He does not meet the clinical picture or 2015 diagnostic criteria for chronic fatigue syndrome. I believe his chronic fatigue is multifactorial in the setting of chronic pain, poor sleep hygiene, possible narcolepsy, possible OSA not on treatment, depression, deconditioning, polypharmacy, and chronic insomnia.

(R. 740.)

Wangensteen noted that based on Plaintiff's reports, it appeared that he had not been formally diagnosed with narcolepsy by a sleep medicine provider ("SLM"). (R. 740.) In addition, he had not had a follow up on his reported obstructive sleep apnea ("OSA"). (R. 740.) Wangensteen strongly encouraged Plaintiff to be seen by a local SLM provider for further evaluation to ensure he did have narcolepsy and/or OSA, and was properly being treated. (R. 740.) It was also noted that Plaintiff had been recently diagnosed with colon adenocarcinoma and that the recommendation, which was colon resection, had not yet performed. (R. 741.) Plaintiff was also to complete the fibromyalgia and chronic fatigue treatment program, which was an eight-hour self-management program. (R. 742.) Wangensteen strongly encouraged Plaintiff to work with his local primary care provider for referrals for physical and occupational therapy, which she believed would result in "significant benefits." (R. 741.)

On December 6, 2022, Plaintiff complained of fatigue, claiming that he slept 18 hours a day most days.  (R. 1291.)

On December 13, 2022, Plaintiff presented with complaints of pain throughout his body.  (R. 888.)  Plaintiff had not yet a colonectomy due to his daughter's accident.  (R. 889.)  Plaintiff was taking buprenorphine-naloxone, Zolpidem Tartrate, prednisone, Fluoxetine and Methylphenidate.[19]  (R. 890.)  Plaintiff reported that he had a girlfriend and was sexually active. (R. 891.)  Plaintiff claimed he was able to bathe himself, clean the house, be continent of bladder, be continent of bowel, converse meaningfully, dress himself, drive, feed himself, find his way home, and live independently.  (R. 891.)  Plaintiff's examination showed that he not in any acute distress, he was calm, cooperative, and had a good ability to communicate.  (R. 893.)  The diagnosis for Plaintiff included chronic pain, fatigue, and opioid dependence.  (R. 893-94.)  Plaintiff was prescribed with buprenorphine-naloxone and oxycodone.[20]  (R. 894.)

On December 27, 2022, Plaintiff reported that his pain was better on oxycodone. (R. 1010.)

On January 15, 2023, it was recommended Plaintiff stop taking Ambien given his complaints about being tired, since it promotes sleep.  (R. 1282.)

---

[19]    Methylphenidate is used to control symptoms of attention deficit hyperactivity disorder and to treat narcolepsy.  *See* https://medlineplus.gov/druginfo/meds/ a682188.html (lasted visited July 15, 2025).

[20]    Oxycodone is used to relieve severe, acute pain.  *See* https://medlineplus.gov/ druginfo/meds/a682132.html (last visited July 15, 2025).  Also referred to under the brand name Percocet.

On January 24, 2023, Plaintiff reported that he was feeling very fatigued, noting that the amount of his fluoxetine had been decreased to avoid fatigue with no benefit. (R. 981-82.) Plaintiff also asserted that the Adderall was no longer effective at keeping him awake and believe his suboxone pain medication was making him feel tired. (R. 981-82.) It was noted that in the November 2022 drug testing showed Plaintiff was positive for fentanyl and metabolites. (R. 982.) Plaintiff denied using fentanyl but thought it could be in some medication he was taking. (R. 982.) Plaintiff was also positive for methamphetamines. (R. 982.) Plaintiff was not any distress and still reported having a girlfriend, having sex, being able to care for himself and clean the house, and being able to drive. (R. 984.) Plaintiff was taking Percocet and buprenorphine-naloxone for his pain. (R. 986.) Plaintiff reported good pain relief with the Percocet. (R. 989.)

On February 7, 2023, Plaintiff reported that he believed that his pain medications were making him fatigued. (R. 1021, 1027.)

On February 14, 2023, Plaintiff asserted that his new diagnosis of diabetes was not really what he needed, as he had multiple stressors including his daughter's accident, his own health issues, and the lack of effect of long-acting Adderall on his narcolepsy. (R. 1272.)

On February 27, 2023, Plaintiff noted that his fatigue had not improved with a decrease in pain medications, and the plan was to further decrease the pain medication. (R. 1122, 1129.) Plaintiff also noted that the decrease in pain medication did not affect his pain relief. (R. 1122.) Plaintiff reported that he had a new diagnosis of diabetes and

that his greatest source of pain involved neuropathy.  (R. 1122.)  Plaintiff was not in any acute distress.  (R. 1126.)

A March 13, 2023 examination of Plaintiff showed that he had a normal constitutional assessment and that he appeared healthy and calm.  (R. 1371.)

On July 11, 2023, it was noted that Plaintiff had been diagnosed with an autoimmune skin disorder and was taking prednisone.  (R. 1058.)  He also had not had his colon surgery because he was scared.  (R. 1066, 1079.)  Plaintiff had received good pain relief from his pain medications, but believed that they were causing him fatigue. (R. 1066.)

On July 14, 2023, Plaintiff reported chronic fatigue and that he was tired throughout the day and struggled to do activities.  (R. 1248.)  He did not feel that Adderall worked as well as Vyvanse, and wondered whether a higher dosage was possible.  (R. 1248.)  Vyvanse was substituted for Adderall by his provider for his fatigue.  (R. 1250.)

On August 8, 2023, it was noted that Plaintiff had scheduled a procedure for his colon cancer for August 17, 2023.  (R. 1179.)  Plaintiff continued to take buprenorphine-naloxone and oxycodone for his pain.  (R. 1179.)  Plaintiff continued to complain of pain all over his body with swelling at the joints, with no answers as to why through testing. (R. 1187.)  Plaintiff did not want to proceed with colon surgery for his cancer and there was concern regarding his memory and insight into his issues.  (R. 1187-88.)  The provider was unsure if the memory issue was "numerological" (presumably neurological) or drug induced.  (R. 1188.)

During the February and August 2023 hearings before ALJ, Plaintiff testified that he needed to lie down 1-3 hours per day over the previous two years because of his cancer as well as an unspecified disease that was eating away at his bones and muscles. (R. 62.)  He also had tiredness due to narcolepsy and sleep apnea.  (R. 63.)  Plaintiff reported that he needed to lie down due to his pain.  (R. 77-78.)  He also admitted that the Vyvanse helped him a little bit with his fatigue.  (R. 100.)  He asserted that his energy level "took a big hit" four months earlier.  (R. 100.)

### III.    LEGAL STANDARD

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence in the record as a whole supports the decision, 42 U.S.C. § 405(g), or if the ALJ's decision resulted from an error of law, *Nash v. Comm'r, Soc. Sec. Admin.*, 907 F.3d 1086, 1089 (8th Cir. 2018) (citing 42 U.S.C. § 405(g) and *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018)).  "Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusions." *Id.* (quoting *Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007).  The Court "considers evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Id.*  "If substantial evidence supports the Commissioner's conclusions, this court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome." *Id.* (citation omitted).  In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact for that of the ALJ. *Hilkemeyer v. Barnhart*, 380 F.3d 441, 445 (8th Cir. 2004).  "Assessing and

resolving credibility is a matter properly within the purview of the ALJ." *Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016) (citing *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003) ("Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide.")).

## IV.    DISCUSSION

Plaintiff argues that the ALJ erred as a matter of law by failing to cite or otherwise consider Social Security Ruling ("SSR") 14-1p, which pertains to evaluating Chronic Fatigue Syndrome ("CFS").  (Dkt. 11 at 12.)  Plaintiff further argues that the RFC is not supported by substantial evidence, as to fails to adequately assess the frequency with which fatigue is reported in the record, and as a result it was reversible error for the ALJ not to have included some kind of limitation for off-task time or absences (or need for additional breaks) into the RFC, rendering the hypothetical question posed to the VE inadequate.  (Dkt. 11 at 13-14.)  The Court addresses these arguments in turn.

## A.    Social Security Ruling 14-1p

Plaintiff argues that the ALJ committed legal error by failing to cite or otherwise consider Social Security Ruling ("SSR") 14-1p, which pertains to evaluating CFS.  SSR 14-1p addresses how the Social Security Administration ("SSA") develops evidence regarding whether a person has a medically determinable impairment ("MDI") of CFS and how it evaluates this impairment in disability claims.  *See* Titles II & XVI: Evaluating Claims Involving Chronic Fatigue Syndrome, SSR 14-1p, 2014 WL 1371245 (S.S.A. Apr. 3, 2014).  SSR 14-1p sets forth "guidance and clarity as to how a claimant can establish—and an adjudicator can conclude—that the claimant has medically

determinable CFS." *Scott H. v. Saul*, No. 20-CV-847 (HB), 2021 WL 2379420, at *4 (D.

Minn. June 10, 2021) (citing SSR 14-1p, 2014 WL 1371245, at *2). SSR 14-1p

establishes that once an MDI of CFS is established, "[the SSA] will consider this MDI in

the sequential evaluation process to determine whether the person is disabled." SSR 14-

1p, 2014 WL 1371245 at *8 (footnote omitted). In other words, there is no difference

with respect to how CFS is evaluated in the sequential evaluation as compared to any

other impairment. *See Scott H.*, 2021 WL 2379420, at *4 ("More importantly, Plaintiff is

not correct that SSR 14-1p establishes a different framework for evaluating whether a

claimant is disabled as a result of CFS. Instead, SSR 14-1p specifically provides that the

SSA will use the same sequential evaluation process it uses to evaluate any other

impairment."). Further, there is no requirement that an ALJ cite to SSRs in her opinion,

only that the ALJ correctly apply them. *See B.-I. v. Kijakazi*, No. 21-CV-0238

(ECT/JFD), 2022 WL 1423595, at *5 (D. Minn. Apr. 19, 2022) ("Although there is no

requirement that an ALJ cite to Social Security Rulings in his or her written decision, the

ALJ's decision must be based upon application of the correct legal standard and

supported by substantial evidence in the record.") (citation omitted), *R. & R. adopted sub*

*nom.*, 2022 WL 1423313 (D. Minn. May 5, 2022).

Here, the ALJ found that CFS was an MDI, then found at step three that CFS was

a severe impairment, and then addressed any resulting limitations as part of the RFC

analysis at steps four and five. (*See*, *e.g.*, R. 17, 21, 23-24.) That is all that is required.

As such, the Court finds no legal error as it relates to whether the ALJ adequately

followed SSR 14-1p.

B.      **Plaintiff's RFC**

Plaintiff next argues that because the record is replete with references to Plaintiff's fatigue from all of his ailments, including Plaintiff's reports of needing to sleep up to 18-20 hours per day, and references to Plaintiff's use of medications, including Adderall to keep him awake, it was reversible error not to include a limitation for off-task time or absences (or need for additional breaks) in the RFC, leading to the ALJ posing an incomplete hypothetical to the VE. (Dkt. 11 at 14-15.) Plaintiff also asserts that the ALJ's assertion that there was no basis for Plaintiff's claims that he needed to lie down multiple times a day because it was not supported by objective evidence ignores the SSA's guidance for CFS, as there is no diagnostic test for CFS. (*Id.* at 14.) The Commissioner counters that the ALJ did not solely rely on objective medical evidence to discount Plaintiff's claims, but also relied on opinion evidence and Plaintiff's activities of daily living, and that regardless of whether there is evidence in the record to support greater limitations than those adopted by the ALJ, there was substantial evidence to support the ALJ's decision. (Dkt. 14 at 9-10.)

A disability claimant has the burden to establish his RFC. *See Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004). The Eighth Circuit has held that "a 'claimant's residual functional capacity is a medical question.'" *Id.* (quoting *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)). "'[S]ome medical evidence' must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace.'" *Id.* (quoting *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam)). However, "there is no

requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (citing *Myers v. Colvin*, 721 F.3d 521, 526-27 (8th Cir. 2013); *Perks v. Astrue*, 687 F.3d 1086, 1092-93 (8th Cir. 2012)).  Rather, the RFC should be "based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations." *Id.* (quoting *Myers*, 721 F.3d at 527).  Indeed, "'[e]ven though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner.'"  *Perks*, 687 F.3d at 1092 (citations omitted) (quoting *Cox*, 495 F.3d at 619-20).

When evaluating statements regarding the intensity, persistence, and limiting effects of symptoms in disability claims, the SSA "examine[s] the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record."  SSR 16-3p, 2016 WL 1119029, at *4.  This evaluation includes consideration of the following factors: "(i) the claimant's daily activities; (ii) the duration, frequency, and intensity of the claimant's pain; (iii) precipitating and aggravating factors; (iv) the dosage, effectiveness, and side effects of medication; and (v) the claimant's functional restrictions."  *Vance v. Berryhill*, 860 F.3d 1114, 1120 (8th Cir. 2017) (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)) (citation omitted); *see also* 20 C.F.R. § 404.1529(c)(3); 20 C.F.R. § 416.929(c)(3); SSR 16-3p, 2016 WL 1119029, at *7.  The ALJ also considers whether there are inconsistencies

between the claimant's statements and the rest of the medical evidence, only accepting

those statements that can "reasonably be accepted as consistent" with the rest of the

record in making its RFC determination.  *See* 20 C.F.R. § 404.1529(c)(4); 20 C.F.R. §

416.929(c)(4).

With respect to Plaintiff's assertion that his CFS necessitated an additional

limitation that he must lie down multiple times a day, the ALJ concluded that:

> The claimant's allegation that must lie down multiple times during day [sic]
> is not well supported by objective evidence from exams or imaging or by
> persuasive opinion evidence. Additionally, the claimant has admitted he is
> able drive and also noted he can prepare simple meals, do some chores and
> spends some leisure time tinkering with vehicles (Hearing, 4E). While these
> activities do not prove he can work full time, they tend to rebut his other
> allegations of constant, debilitating, and unremitting pain and other
> symptoms. Overall, there is limited evidence of impairments sufficiently
> severe as to interfere with the performance of at least light work with
> allowance for limits on the use of hand and foot controls as well as a range
> of narrowly tailored and symptom-specific reaching, postural, manipulative,
> environmental and mental limitations. While no one factor cited above is
> dispositive, and each perhaps on its own does not establish anything
> conclusively, the totality of the facts and circumstances cited above made it
> difficult for me to rely heavily on the claimant's subjective complaints.
> Consequently, I have relied greatly on the available objective medical
> evidence of record and the persuasive medical opinion.

(R. 21.)

Plaintiff cites *Michael A. K. v. Kijakazi*, No. 20-1584 (PAM/DTS), 2021 WL

3293519, at *3 (D. Minn. Aug. 2, 2021), in support of argument that the ALJ here erred

by only considering the objective medical evidence, as there is no diagnostic test for CFS.

(Dkt. 11 at 14-15.)  Indeed, the court in that case reversed the ALJ's decision, finding:

> [D]ismissal of his treatment because it was "routine" and "outpatient-only"
> ignores the Centers for Disease Control's statement that there is no accepted
> treatment for this disorder, and the Social Security Administration's own

guidance that treatment for chronic fatigue syndrome is often sporadic, and that conflicting evidence in the medical record is not unusual.

*Id.* at *3 (cleaned up). However, as noted by the Commissioner, the ALJ relied on the opinion evidence and Plaintiff's daily activities as well as the objective medical evidence when rejecting an additional limitation based on Plaintiff's fatigue, including when considering Plaintiff's CFS in combination with the symptoms of his other impairments.

There is no dispute that medical record contains numerous references to Plaintiff suffering from fatigue, his diagnoses of CFS and narcolepsy, and to Plaintiff's prescriptions to treat his fatigue. (*See supra*, Section II.) However, "[i]t is important [to] emphasize that a diagnosis alone does not require a finding of disability; there must be a functional loss establishing the inability to engage in substantial gainful activity." *Michael G. v. Bisignano*, No. 24-CV-02160 (ECT/ECW), 2025 WL 1557896, at *10 (D. Minn. May 14, 2025) (citing *Trenary v. Bowen*, 898 F.2d 1361, 1364 (8th Cir. 1990)), *R. & R. adopted*, 2025 WL 1555745 (D. Minn. June 2, 2025) (citation omitted). Here, the record demonstrates that the ALJ considered Plaintiff's complaints of fatigue and found that his fatigue, as well as Plaintiff's other symptoms, limited Plaintiff as follows:

The claimant's pain, **fatigue**, swelling, stiffness, and difficulties lifting [sic] him to light work. These signs and symptoms as well as tremors, reduced ranges of motion, weakness at times, hand pain with problems gripping, leg pain, isolated instances of antalgic gait and overall reduced physical function are accommodated in finding he can frequently push and pull with hand and foot controls, can frequently reach overhead and in all directions bilaterally, can handle, finger, and feel frequently with both hands, can never use ladders, ropes and scaffolds, only occasionally crawl, and only frequently stoop, kneel, crouch, climb ramps and stairs, as well as balance. These factors as well as the distracting effect of pain and brain fog also dictate he can face no exposure to unprotected heights and moving mechanical parts, cannot operate a motor vehicle and can face no exposure to extremes of heat or cold

> or vibration. The claimant's deficits in focus, attention, concentration, persistence and pace with attendant anxiety limit him to only simple routine tasks and simple work related decisions.

(R. 23-24 (emphasis added).)

The question becomes whether Plaintiff's complaints of fatigue supported additional limitations of lying down or other time off as part of the RFC. While there is no dispute that Plaintiff suffered from fatigue, during his hearing, Plaintiff testified that he needed to lie down for the following reasons unrelated to his fatigue:

> It's partially because of the cancer and partially because of the disease. We still don't know what's eating all the bones and muscles away. All they know is they're deteriorating fast. They just don't know why.

(R. 62, *see also* R. 77-78 (having to lie down due to pain).)

Further, despite references in the record where Plaintiff claimed he could only stay awake for a few hours a day, Plaintiff testified at the hearing that his medication helped him a little bit with his fatigue, and the medical record noted that Plaintiff "did have worsening when off meds in the past." (R. 100, 576.) In other words, Plaintiff's fatigue was at least partially relieved when he was taking his medication.

Moreover, the state agency doctors relied upon by the ALJ took into account Plaintiff's assertion of fatigue and narcolepsy, and his assertion on April 13, 2021 that he could only be up for a few hours a day, yet found as part of the initial determination and on reconsideration that Plaintiff was able to perform work at the light exertional level, with an ability to lift up to 20 pounds occasionally and 10 pounds frequently and had the ability to sit for 6 hours of an 8-hour workday and stand and walk for 6 hours, along with other limitations. (R. 126, 129-32, 140-43.) The state agency doctors did not assess

Plaintiff with limitations relating to time off task or lying down.  (R. 126, 129-32, 140-43.)  Indeed, Plaintiff's own treating provider, Dr. Rossmiller, did not mention a requirement that Plaintiff needed to lie down in his Medical Source Statement of Ability to Do Work-Related Activities (Physical), and the reasons for the limitations set forth by Dr. Rossmiller did not include Plaintiff's fatigue.  (R. 714-17.)

Not only does the medical opinion evidence support the RFC, but Plaintiff's daily activities also cut against more onerous restrictions based on his physical limitations, including any assertion that he needed to have time off or needed to lie down during the day due to fatigue.  "[I]t is well-settled law that 'a claimant need not prove []he is bedridden or completely helpless to be found disabled.'"  *Reed v. Barnhart*, 399 F.3d 917, 923 (8th Cir. 2005) (quoting *Thomas v. Sullivan*, 876 F.2d 666, 669 (8th Cir. 1989)) (citations omitted).  However, a claimant's daily activities are one factor an ALJ must consider when evaluating the claimant's testimony and subjective limitations.  *See Swarthout v. Kijakazi*, 35 F.4th 608, 612 (8th Cir. 2022) ("While daily activities alone do not disprove disability, they are a factor to consider in evaluating subjective complaints of pain.") (cleaned up).  Here, the record contains evidence that Plaintiff occasionally repaired vehicles, regularly drove his car, would play football with his son (stopping because of pain but not fatigue), and was able to maintain a romantic relationship for at least a year.  (*See, e.g.*, R. 369-70, 509, 891, 966, 984.)

While Plaintiff points to evidence inconsistent with the ALJ's decision, the issue "is not whether substantial evidence exists to reverse the ALJ," but "whether substantial evidence supports the ALJ's decision."  *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir.

2010) (citing *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)).  Here, the evidence discussed above does support the ALJ's decision and meets the substantial evidence standard.  Accordingly, the Court rejects Plaintiff's challenge to the RFC.  Consequently, the hypothetical question the ALJ posed to the VE was proper, and the VE's answer with respect to Plaintiff's ability to perform work in the national economy in significant numbers constitutes substantial evidence supporting the Commissioner's denial of benefits.  *See Lacroix v. Barnhart,* 465 F.3d 881, 889 (8th Cir. 2006).

\* \* \*

For all these reasons, the Court finds that Plaintiff's request for remand of the Commissioner's decision should be denied and that the Commissioner's request that the decision be affirmed be granted.

## V.    RECOMMENDATION

Based on the above, and on the files, records, and proceedings herein, **IT IS RECOMMENDED** that:

1.    Plaintiff's request for reversal or remand of the Commissioner's decision (Dkt. 11) be **DENIED**;

2.    The Commissioner's Motion for Summary Judgment (Dkt. 13) be **GRANTED**; and

3.    The Complaint (Dkt. 1) be **DISMISSED WITH PREJUDICE**.

DATED:  July 16, 2025                    *s/Elizabeth Cowan Wright*
                                         ELIZABETH COWAN WRIGHT
                                         United States Magistrate Judge

## **NOTICE**

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in D. Minn. LR 72.2(c).